IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,      )
                               )
                   Plaintiff,  )
                               )
        vs.                    )      Case No. 3:25-cr-30137
                               )
BRANDON D. BARNETT,            )
                               )
                   Defendant.  )

**MEMORANDUM & ORDER**

**DUGAN, District Judge**:

Before the Court is Defendant Barnett's Motion to Suppress Evidence and Memorandum in Support thereof (collectively, "Motion to Suppress"). (Docs. 26 & 27). The Government filed a Response in Opposition to the Motion to Suppress (Doc. 32) to which Defendant filed a Reply (Doc. 35) For the reasons explained below, the Motion to Suppress will be **Granted**. On June 22, 2026, Defendant Barnett filed the instant Motion to Suppress. The factual basis for the Motion to Suppress, which appears to be largely undisputed based upon the parties' filings, is summarized immediately below.[1] [2]

---

[1]Under the Court's Case Management Procedures, "[g]enerally, motions to dismiss indictments and motions to suppress evidence will be set for hearing." *See* Case Management Procedures of District Judge David W. Dugan, pg. 13. The Government in its Response indicates that "[a]n evidentiary hearing is unnecessary because there are no disputed facts." (Doc. 32, p. 19.) In Defendant's Reply brief, however, he raises factual disputes yet agrees that "an evidentiary hearing is unnecessary". (Doc. 35, p. 6). Out of an abundance of caution, the Court invited the Government to confirm that it did not require an evidentiary hearing, to which it confirmed that no such hearing is necessary.

[2]The Government manually filed "Exhibit 1—Officer Mister Body-Worn Camera footage" and "Exhibit 2 — Officer Stricklin Body-Worn Camera" of Officer Callahan of the Fairview Heights Police Department. (Doc. 33). The Court viewed Exhibit 1 and 2, then incorporated facts and timestamp citations from the footage into the summary of the basis for the Motion to Suppress.

## I. BACKGROUND

On May 7, 2025, while discussing with another and unrelated citizen who had been stopped for possessing in the McDonald's parking lot what might be marijuana, East St. Louis PD Officer Teron Mister and Officer Blake Strickland were approached by a McDonald's employee. (009:00). The employee related that her manager said that there is "someone at the counter . . . he's got a gun…a gun up under his arm. . . he gotta, uh, firearm on him"      . Officer Mister asks the employee to describe what he is wearing and she indicated that she needed to ask her manager. Apparently, the employee texted her manager. Shortly after, the employee indicated that he was wearing yellow. (009:40)

Officers Mister and Strickland then entered the store and proceeded toward Defendant who was wearing a yellow jumpsuit. Officer Mister held Defendant at gunpoint while Officer Strickland conducted a pat down of Defendant left waist and area below his left arm, where he discovered an object that was later identified as a desert tan colored Glock semi-automatic pistol. Defendant raised his hands and complied with Officer Mister's instructions not to move. (010:30).  Defendant was then handcuffed. Defendant said "grab my phone," and asked "what I do".  As Defendant was being escorted from the building, Officer Mister responded by saying: "you walked in here with that m***** f*****" referencing the handgun. (0:10:55) The Defendant then volunteered "I just came home, bro." Officer Mister asked, "came home from where?", to which Defendant replied "Feds, bro. I just came home." (0:11:04). As they arrived at the patrol cars in the parking lot where other law enforcement officers were gathered, still

addressing the man possibly in possession of marijuana, Officer Mister told them that a McDonald employee had reported "we see the butt of gun pointing out." (0:12:20).

Having summarized this factual basis, the Court now resolves the arguments stated in Defendant's Motion to Suppress and the Government's Response.

## II. ANALYSIS

Defendant argues that he was seized and that seizure was illegal because it was not based upon "reasonable suspicion". He contends that Officer Strickland "seized Defendant solely because a McDonalds employee "believed" he/she saw the imprint of a firearm inside of his jacket." (Doc. 27, p. 3). Defendant continues by arguing that "possession for a concealed firearm, however, is not a crime in the great State of Illinois and alone cannot justify Ofc. Stricklin's' seizure of Defendant." *Id.* He concludes by asserting that "[b]ecause this was the only reason for the seizure Ofc. Stricklin's subsequent search of Defendant violated the Fourth Amendment." *Id.*

A motion to suppress seeks to exclude evidence obtained in violation of a defendant's constitutional rights. The Fourth Amendment provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures ...." UNITED STATES CONST. amend. IV. The Supreme Court has explained that "[i]n order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, this Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial

evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968).

The Supreme Court recognized an exception to the probable-cause rule in *Terry v. Ohio,* 392 U.S. 1,(1968). There, the Court ruled that "police conduct, necessarily swift action predicated upon the on-the-spot observations of the officer on the beat...as a practical matter could not be, subjected to the warrant procedure." 392 U.S. 1, 20 (1968). Accordingly, under *Terry*, police officers may briefly detain a person for investigatory purposes based on the less exacting standard of reasonable suspicion that criminal activity is afoot. 392 U.S. at 21–22.

A *Terry* stop is a brief investigative detention that provides the officer with an opportunity to verify or dispel well-founded suspicions that the person has been, is, or is about to engage in criminal activity. See *United States v. Griffin*, 150 F.3d 778, 783 (C.A.7 (Ill.), 1998). To justify a *Terry* stop, the police officer must have specific and articulable facts taken together with rational inferences to warrant the intrusion. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. See *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir.1999) ("Since the Supreme Court's decision in Terry, it has been established that a law enforcement officer may conduct a brief, non-intrusive detention of a person if the officer has specific and articulable facts sufficient to give rise to a reasonable suspicion that the person had committed or is committing a crime.") (citations omitted). When considering "the reasonableness of a *Terry* stop, the objective standard is whether the facts available to the officer at the time of the seizure warrant a person of reasonable caution to believe that the action taken was appropriate." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994).

"The reasonableness of an investigatory stop also depends on the extent of the intrusion." *Id.* Also, reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch'" but "considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123–24, (2000). Ultimately, the determination of reasonable suspicion "must be based on commonsense judgments and inferences about human behavior." 528 U.S. at 120. Because determining reasonable suspicion involves probabilities and does not always involve hard certainties, the standard of the totality of the circumstances is applied. "Officers may lean upon their experience and specialized training to draw inferences from and deductions about available cumulative information." *United States v Hill*, 818 F.3d 288, 294 (7th Cir. 2016). See also *United States v. Olson*, 41 F.4th 792, 800 (C.A.7 (Wis.), 2022)

The Government contends reasonable suspicion existed because "the McDonald's employee's report reasonably led Officers Stricklin and Mister to believe that their response was urgent because defendant had exposed a firearm in the restaurant." (Doc. 32). Further, the Government points to the high crime in the East St. Louis area generally and "the history of gun violence" at that McDonald's" specifically. *Id.* According to the Government, "exclusion of evidence is contrary to the rule's policy because it would a great societal cost by signaling to officers that citizen safety from gun violence should not he one of their primary concerns." *Id.*

### THE VIDEOS

The Court reviewed the body camera videos presented by the Government. Those body camera videos depict an employee of McDonalds reporting, without apparent

excitement or urgency, that her manager texted her about a man at the counter who had a gun under his arm. At the time she reports this information to the Officer, she makes a motion pointing to an area near the right rib cage are and between the waist and shoulder. She does not suggest in any way that a robbery, theft, or any disruption was taking place or about to take place inside McDonalds. The employee says nothing about Defendant's action other than he possessed a firearm. She does not say, for example, that he wielded or brandished the firearm, or that he made threats to or was frightening anyone.

It is evident from the videos that the manner in which the employee approached and spoke to the officers there was no emergency or disturbance occurring in the McDonald's store. Rather, the employee appears in the videos to be largely apathetic to Defendant's presence. The lack of any urgency or disturbance is also consistent with the manner in which the officers executed their "investigation" of Defendant. At no time did they approach him aggressively or tactically as if he presented a danger to them. Rather, they slowly and calmly sauntered into the restaurant and walked up to Defendant, who never looked their way as he studied the menu marque over the counter. Defendant did not make any furtive movements nor attempt to walk away. See *United States v Williams*, 731 F. 3d 678, 687 (7th Cir. 2013) ("Most people, when confronted by a police officer, are likely to act nervous, avoid eye contact, even shift their bodies as to move away from the area . . .") Officer Strickland pointed his service weapon at the face of Defendant and said "don't f****** move". Officer mister located the then fully concealed weapon inside Defendant's jacket and took possession of it. Defendant did not resist and he himself appears to be relatively calm. In short, neither the videos, incident reports nor those who

were involved suggest that that any criminal activity was afoot or had been interrupted by police presence. The videos suggest to the Court that it was an otherwise calm early summer morning with nothing to indicate that Defendant had engaged in activity other than preparing place an order at McDonalds when a gun was put in his face, searched and handcuffed.[3]

### THE FIREARM

The Government makes a somewhat strained argument that the employee believed that the manager saw the "butt of the gun" and that 430 ILCS § 66/5, which "prohibits exposing a firearm" provides the basis for the belief that criminal activity was underway. Two problems. First, there is no evidence that the firearm itself was ever exposed, handled or brandished. Exhibit A, the Officers' Report, indicates that the employee "informed officers that another worker believed to have seen an imprint of a firearm that was tucked inside of a customer's . . . jacket. (Doc. 32, p. 20)  Second, § 66/5 provides that a "concealed firearm means a loaded or unloaded handgun carried on or about a person completely or mostly concealed from view . . .". The Government relies on *United States v Alexander* for the proposition that exposure of a firearm for even a short

---

[3] Neither party addresses whether this encounter was an arrest instead of an investigative stop. As Justice Hamilton observed in his dissent: "The line between a *Terry* stop and an arrest is "not bright," *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005), but it is exceedingly important. Terry recognized a "wholly different kind of intrusion upon individual freedom" based, for the first time, on less than probable cause to believe the suspect was engaged in crime. *Terry v. Ohio,* 392 U.S. 1, 26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If courts allow law enforcement officers to cloak as "investigatory stops" what are really just arrests without probable cause, all of us will have less liberty than the founders established for us in the Fourth Amendment. *United States v. Eymann*, 962 F.3d 273, 292 (C.A.7 (Ill.), 2020)

period of time, such as five seconds, is sufficient to violate the statute. (Doc. 32, p.11-12) 78 F. 4th 346 (7th Cir., 2023).

In *Alexander*, the Chicago Police Department was alerted to possible gunshots on the City's west side. When the Police activated surveillance cameras in the area, they observed a large group congregating. The monitoring officers saw a man hand a gun to Alexander. Alexander "held the gun openly for approximately five seconds before concealing it in his waistband." *Id*. at 347. The officers who saw the hand-off went to the scene and, when they arrived, they observed Alexander turned and moved away. He was handcuffed and frisked. The gun was found in his waistband. *Id.*

Alexander argued that the officers lacked probable cause to arrest him because they had no reason to believe that he possessed the gun unlawfully. The Court noted that even if the arresting officers did not know that he had a felony conviction or lacked a concealed carry license, they had probable cause because Illinois' Concealed Carry Act allows a person with a license to carry a firearm on a public street only if it "completely or mostly concealed from view, but here, the officers saw Alexander on surveillance footage openly carrying a firearm." *Id.*

*Alexander* does not help Government's position. Here, there is no surveillance of Defendant *openly* carrying the firearm or any evidence that firearm itself was visible. By all accounts, the firearm was "completely or mostly concealed from view." When Defendant was first encountered by Officer Mister, the weapon was completely concealed, and it was necessary that he unzip Defendant's jacket to access it.

The Government next cites to *United States v Richmond*, 924 F3d 404 (7th Cir., 2019) for the proposition that an officer's observation of a "significant bulge" in an individual's pocket coupled with a high crime area is enough to provide a reasonable suspicion. However, in *Richmond*, Milwaukee Police Officers were patrolling a residential neighborhood known for drug trafficking, armed robberies and gun violence. Around midnight, the officers saw Richmond walking toward them on the sidewalk. He strode with his left hand free at his side and his right hand in the "kangaroo" pocket on the from of his shirt. One officer saw "a significant bulge from this pocket" and the other described the bulge as a "medium-sized to larger object" protruding through Richmond's front pocket". But, quite different from the facts in this case, "after the officers passed Richmond, he changed direction, quickened his pace, crossed the front lawn of a residential duplex, and moved toward the stairs up to its front porch." *Id* at 409. Far from relying on just the observation of a "significant bulge", the Court stated that four categories of fact created a suspicion that Richmond was illegally carrying a gun or was otherwise engaged in unlawful activity. These included Richmond walking at night in area plagued by drug and gun violence; the presence of a significant bulge; police officer's 25 years of experience that a protrusion of the kind they saw is likely a gun; and Richmond's evasive behavior as well as his attempt to hide the gun. *Id* at 411.

*Richmond* does instruct, however, that "a neighborhood beset by drug trafficking and gun violence does not, by itself, support a particularized suspicion" that an individual is committing a crime." *Id*. Rather, such considerations are "among the relevant contextual considerations in a reasonable suspicion analysis." *Id* at 411-412 It

also teaches that the individual's attempts to evade an encounter with police is a relevant factor. *Id* at 412.

Again, the events surrounding this encounter differ greatly from those in *Richmond*. The encounter here took place at midday at a McDonalds restaurant. The "bulge" here was not observed by a law enforcement with years of experience but was reported through second-hand text messages sent to an employee from McDonald's manager. And, significantly, Defendant did not attempt to evade or respond nervously to the presence of law enforcement. *Richmond* does not help the Government.

The Government next suggests that the situation was emergent. (Doc. 32, p. 17). It argues that because there had been a "spontaneous complaint from a reliable eyewitness" from "inside a private business" and within "a city of devastating crime and violence", Officers Stricklin and Mister "already had reasonable suspicion that Defendant illegally possessed a firearm.". (Doc. 31, p 18) The Government goes on to argue that the officers were further justified because Seventh Circuit precedent provides that law enforcement does not need to assume a person is a CCW holder. It relies on *United States v Swinney* 28 F. 4th 864 (2022). But in *Swinney*, on an anonymous tip, the defendant was identified wearing a black fur coat having "just pulled a large gun from his pocket" just before entering a liquor store. *Id* at 865. Under such circumstances, the Court noted, "[i]t does not matter that the police did not see Swinney doing anything suspicious once they arrived on the scene." *Swinney* at 868. Certainly, the officer in Swinney had adequate information to justify the stop. The tipster reported the brandishing of a firearm and the defendant entering a liquor store with it, both of which are crimes in Illinois. Again,

Fourth Amendment protections are satisfied when a person is stopped on a reasonable suspicion of criminal activity, and they are not satisfied when the stop is premised solely on possession of a concealed firearm in a place where he is not forbidden to carry it.

**SOCIETAL COSTS ASSOCIATED WITH ENFORCEMENT OF THE FOURTH AMENDMENT**

The Court is quite aware of the extent of gun violence in and around the City of East St. Louis. It is also aware of the challenges that law enforcement faces each day in its effort to secure community peace and fighting crime that sometimes seems rampant. In this vein, the Government argues that, even if there was no reasonable suspicion, the societal cost of exclusion of the evidence is too great for the citizens of East St. Louis. (Doc. 32, p. 18) The societal cost the Government speaks to is the indisputable toll that erosion of public trust, increase in fear, and flight to safer areas taxes a crime-ridden community. *Id*. at 18-19. But notwithstanding East St. Louis being a dangerous place to live and to work, the Fourth Amendment protections cannot yield entirely given the facts presented here. The Court does not believe that in every case the "societal costs" of the exclusionary rule justify a utilitarian compromise to rationalize relaxing Fourth Amendment protections just because the law enforcement operates in a dangerous town

### III. CONCLUSION

Police officers generally cannot perform a search without a warrant that is supported by probable cause. See *Lange v. California*, 594 U.S. 295, 141 S. Ct. 2011, 2017 (2021)) Indeed, warrantless searches are *per se* unreasonable under the Fourth Amendment. *United States v. Salazar*, 69 F.4th 474, 477 (7th Cir. 2023) (quoting *Arizona v.*

*Gant*, 556 U.S. 332, 338 (2009)). Therefore, if police officers obtain evidence in violation of the Fourth Amendment, then the usual remedy is for the Court to exclude the evidence and all fruits of the violation from the trial. *United States v. McGill*, 8 F.4th 617, 622 (7th Cir. 2021) (citing *Utah v. Striefl*, 579 U.S. 232, 237-38 (2016)).

Defendant requests that his statement that he had just got home from federal prison made during his arrest also be suppressed as "fruit of the poisonous tree." Certainly, confessions made as a product of an illegal arrest may be excluded. *United States v. Reed*, 349 F 3d. 457 (7th Cir. 2003) However, one exception to the exclusionary rule is that where the Government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means" the evidence should be received. *Nix v Williams*, 467 U.S. 431 (1984); *United States v Eymann*, 962 F.3d 273 (2020). Another exception that may be applicable is the "independent source" rule. There the doctrine permits "evidence obtained in an unlawful search if officers acquired it from a separate, independent source." *United States v Liss*, 103 F3d 617, 621 (7th Cir. 1997). Given that whether or when Defendant was released from federal prison is readily obtainable through a variety of sources, it appears that evidence of his release may have been determined independent of his confession.  The Parties do not address these issues, so the Court will leave determination for another day.

## IV. DISPOSITION

For the reasons explained above, the Motion to Suppress Evidence (Doc. 26) is

**GRANTED**. The Glock firearm seized from the Defendant while being searched shall not

be introduced into evidence at the trial of this matter.

**SO ORDERED**.

Dated: July 18, 2026

Judge Dugan

Digitally signed
by Judge Dugan
Date:
2026.07.18
17:29:05 -05'00'

_____

DAVID W. DUGAN
United States District Judge